CITY OF WOOSTER, Appellee,

v.

ENTERTAINMENT ONE, INC. et al., Appellants.

[Cite as *Wooster v. Entertainment One, Inc.,* 158 Ohio App.3d 161, 2004-Ohio-3846.]

Court of Appeals of Ohio,
Ninth District, Wayne County.

No. 03CA0043.

Decided July 21, 2004.

162

164

H. Louis Sirkin and Jennifer M. Kinsley, for appellants.

Mark W. Baserman Sr., Richard R. Benson Jr., and David R. Langdon, for appellee.

---

BATCHELDER, Judge.

{¶ 1} Appellants, Eric Boron, Entertainment One of Pennsylvania, Inc., and E.V.B., Inc. (collectively, "Erotica"), appeal from the decision of the Wayne County Court of Common Pleas. We affirm.

## I

{¶ 2} The instant matter involves the city of Wooster's enactment of amendments to its zoning code regarding the zoning regulation of sexually oriented

businesses. The change in the zoning ordinances affected Boron's use of certain real property that he owned, and resulted in the underlying action and present appeal.

{¶ 3} On May 20, 2002, Boron, as the agent of E.V.B., Inc., entered into a contract for the purchase of certain real property located on E. Liberty Street in Wooster, Ohio, in Wayne County. This real property is located in a zoning district labeled "C–4," or the central business district in Wooster. Additionally, the real property is located within 1,000 feet of a church, and within 1,000 feet of a residential district as defined by Wooster's zoning ordinance. Boron asserts that his intention was to open an adult book and video store called "Erotica" on the premises.

{¶ 4} At a public hearing held on June 26, 2002, the Wooster City Council voted unanimously to recommend the adoption of Ordinance No. 2002–49, to amend Title Five, Zoning Code of the Wooster Codified Ordinances to include new sections regulating the establishment of sexually oriented businesses within Wooster. Specifically, the proposed sections assign such businesses to specific zoning districts and required that they be at least 1,000 feet from residential neighborhoods, churches, schools, public parks, libraries, and other sexually oriented businesses within Wooster. The zoning ordinance was placed on the agenda for the city council meeting to be held on August 19, 2002.

{¶ 5} On August 5, 2002, Boron, acting on behalf of E.V.B., Inc., applied for building and zoning permits to remodel the existing store area on the premises. Wooster granted the request for the zoning permit on August 9, 2002.

{¶ 6} On August 19, 2002, the city council enacted the zoning ordinance. The zoning ordinance became effective on September 19, 2002. The parties have stipulated to the fact that Erotica "was not open or operating as a sexually oriented business" as of September 19, 2002.

{¶ 7} On August 26, 2002, Wooster issued Boron a 30–day conditional commercial building permit and certificate, which did not authorize Boron to perform any electrical, plumbing, or HVAC work at the premises. Boron began to expend funds for the renovation and remodeling of the premises. Boron paid the purchase price for the property on September 3, 2002.

{¶ 8} In a letter dated October 4, 2002, Wooster's zoning and planning manager, acting upon the newly passed Ordinance, informed Boron that his zoning permit had been revoked. The manager stated, "Pursuant to said Ordinance, sexually oriented businesses are not a permitted use in a C–4 zoning district. Further, the Ordinance provides that no sexually oriented business may locate or operate within 1,000 feet of, among other uses, a church." The letter further explained that because Boron's premises is in a C–4 district and since it

was also within 1,000 feet of a church, his sexually oriented business would be in violation of Wooster's zoning code.[1]

{¶ 9} On October 4, 2002, Wooster filed a complaint against Entertainment One, Inc.,[2] d.b.a. Erotica Books and News, seeking a declaratory judgment pursuant to R.C. 2721.01 et seq. and statutory injunctive relief pursuant to R.C. 713.13, for operating an adult bookstore in an improper zoning district.[3] Specifically, Wooster sought a declaration that the ordinance was valid and constitutional and sought to permanently enjoin Erotica from using the premises for a sexually oriented business.

{¶ 10} On October 10, 2002, the building standards division of the development department issued an adjudication order, this time noting that various construction work performed did not conform to the approved plans and the rules of the Board of Building Standards. On October 24, 2002, Wooster's development department issued an adjudication order that disapproved the floor plans for the new building, noting violations of the Ohio Basic Building Code.

{¶ 11} On October 15, 2002, Boron was issued an exterior sign permit for the store. The same day, city officials inspected the premises, requiring Boron to alter some of the remodeling plans. On October 24, 2002, the officials again inspected the property and determined further reconfiguration was required. On October 29, 2002, Wooster issued Boron a certificate of occupancy for the building alteration.

{¶ 12} On October 31, 2002, Wooster filed a motion for a temporary restraining order, pursuant to Civ.R. 65 and R.C. 2727.02, to enjoin and restrain Erotica from directly and indirectly making use of the premises for the purpose of a sexually oriented business. The trial court granted the temporary restraining order.[4]

---

1. The record reflects that Erotica appealed from this zoning permit revocation to the Wooster Board of Zoning Appeals. However, the trial court later ordered Erotica to withdraw this appeal, noting that Wooster waived and would be precluded from asserting any claim or defense that Erotica failed to exhaust its administrative remedies.

2. Entertainment One, Inc. was later voluntarily dismissed by Wooster as a party. Thereafter, Wooster amended its complaint to add as additional parties Entertainment One of Pennsylvania, Inc., E.V.B., Inc., and Boron.

3. The original complaint also alleged that Erotica was operating without a valid adult entertainment license. However, the claims regarding licensure were eventually dismissed and are not at issue on appeal. While a review of the record reveals that Wooster amended its complaint several times, the substantive legal claims otherwise remained essentially unchanged.

4. On November 19, 2002, the trial court dissolved the order, and, as a result of the expiration of the temporary restraining order, allowed Erotica to use the property as a sexually oriented business. However, the court noted that Erotica waived and was precluded from asserting

{¶ 13} On November 27, 2002, Erotica filed an answer and counterclaim. As an affirmative defense, Erotica asserted that the operation of the business was a valid, nonconforming use based upon substantial expenditures by Erotica, and that Wooster's issuance of building and zoning permits to Erotica estopped Wooster from asserting that Erotica was either not properly operating the business or that the business was not properly located. Erotica's counterclaim sought, inter alia, declaratory judgment that Wooster's revocation of Erotica's zoning permit constitutes a taking of private property without just compensation, that the operation of the store constitutes a valid nonconforming use not subject to the ordinance amendments, and that Wooster's actions constitute a violation of federal civil rights statutes. Erotica also asserted a breach-of-contract claim.

{¶ 14} On December 23, 2002, the trial court held a hearing on the injunction, at which the parties entered into a stipulation of facts. Thereafter, Erotica moved to amend its answer and counterclaim to add an affirmative defense that Wooster was barred from obtaining equitable remedies in court by the doctrines of laches and unclean hands. On April 15, 2003, the trial court granted Erotica leave to file an amended answer to include any affirmative defenses not included in the original answer, which included the unconstitutionality of the ordinances and the doctrine of unclean hands. The matter was scheduled for an evidentiary hearing, which was held on June 6, 2003.

{¶ 15} On June 27, 2003, the court issued an agreed order. This order specified, inter alia, that the remaining claims between the parties consisted of Wooster's declaratory judgment action regarding the zoning ordinance, Wooster's claim for a statutory injunction, and Erotica's counterclaims for a declaratory judgment, injunction, and attorney's fees relating to the zoning ordinance. The court also noted that it would decide these claims on the parties' briefs, as well as the stipulated facts and exhibits entered into the record at the December 23, 2002 hearing.

{¶ 16} On July 17, 2003, the trial court issued findings of fact and conclusions of law. The same day, the court issued a decision finding that the zoning ordinance was constitutional, that Erotica's nonconforming use argument failed because the use did not exist prior to the change in the zoning ordinance, that Erotica's affirmative defenses failed, and that Wooster was entitled to an injunction. On July 25, 2003, the trial court issued an order that granted Wooster's statutory injunction claim, enjoined Erotica from operating and main-

---

any argument or defense arising from their use of the property for such purposes, including that they have established a nonconforming use or that they have obtained a vested right to the use of the premises for that purpose.

taining a sexually oriented business on the premises, and dismissed Erotica's counterclaims with prejudice. This appeal followed.

{¶ 17} Erotica timely appealed, asserting three assignment of error for review.

## II

## A

### First Assignment of Error

"The trial court erred in upholding Ordinance No.2002–49 as a constitutional regulation on the location of adult businesses absent specific, pre-enactment evidence of negative secondary effects."

{¶ 18} In its first assignment of error, Erotica asserts that the trial court erred in upholding Zoning Ordinance No.2002–49 as constitutional. We disagree.

{¶ 19} Initially, we note the appropriate standard of review. When an appellate court reviews constitutional challenges involving the First Amendment, it is required to conduct an independent review of the record. *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686, citing *Edwards v. S. Carolina* (1963), 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697; *State ex rel. Pizza v. Strope* (1990), 54 Ohio St.3d 41, 45, 560 N.E.2d 765; *Urbana ex rel. Newlin v. Downing* (1989), 43 Ohio St.3d 109, 539 N.E.2d 140, paragraph five of the syllabus, following *Bose Corp. v. Consumers Union of the United States, Inc.* (1984), 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502. A strong presumption exists in favor of the validity of a zoning ordinance. *Goldberg Cos., Inc. v. Richmond Hts. City Council* (1998), 81 Ohio St.3d 207, 214, 690 N.E.2d 510. The basis for the presumption of the validity of a zoning ordinance is that a local legislative body, because of its familiarity with the local conditions, is in a better position than the courts to assess the "character and degree of regulation required." *Hudson v. Albrecht, Inc.* (1984), 9 Ohio St.3d 69, 71, 9 OBR 273, 458 N.E.2d 852, citing *Wilson v. Cincinnati* (1976), 46 Ohio St.2d 138, 142, 75 O.O.2d 190, 346 N.E.2d 666, and *Allion v. Toledo* (1919), 99 Ohio St. 416, 124 N.E. 237, paragraph one of the syllabus.

{¶ 20} Additionally, a party that challenges a legislative enactment bears the burden of demonstrating its unconstitutionality. *Goldberg*, 81 Ohio St.3d at 214, 690 N.E.2d 510. When considering a challenge to the constitutionality of a zoning ordinance, a court must apply "all presumptions and pertinent rules of construction so as to uphold, if at all possible, [the] ordinance." *State v. Dorso* (1983), 4 Ohio St.3d 60, 61, 4 OBR 150, 446 N.E.2d 449. Furthermore, a court "should not declare [the ordinance] unconstitutional if there is a rational way, through liberal construction, to preserve its constitutionality." *Union Twp.*

*Bd. of Trustees v. Old 74 Corp.* (2000), 137 Ohio App.3d 289, 295, 738 N.E.2d 477, citing *State v. Sinito* (1975), 43 Ohio St.2d 98, 101, 72 O.O.2d 54, 330 N.E.2d 896. "As long as the validity of the legislation is 'fairly debatable,' the legislative judgment in enacting it is permitted to control." *Hudson,* 9 Ohio St.3d at 71, 9 OBR 273, 458 N.E.2d 852, quoting *Brown v. Cleveland* (1981), 66 Ohio St.2d 93, 98, 20 O.O.3d 88, 420 N.E.2d 103.

{¶ 21} In support of its first assignment of error, Erotica argues that the zoning ordinance constitutes a content-based restriction on speech, in violation of the First and Fourteenth Amendments to the United States Constitution and the First Amendment to the Ohio Constitution.[5] Erotica contends that Wooster's purpose in passing the ordinance regulating the location of sexually oriented businesses was to silence their speech, and not to combat any secondary effects of the speech.[6] Erotica further argues that Wooster failed to base its decision to pass this ordinance on preenactment evidence of secondary effects and that the Wooster council members failed to receive any information about secondary effects prior to deciding to pass the ordinance.

{¶ 22} The United States Supreme Court has declared that "[c]ontent-based regulations are presumptively invalid." *R.A.V. v. St. Paul* (1992), 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305. Generally, a content-based regulation, that which "stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes th[e] essential [First Amendment] right," and therefore is subject to strict scrutiny. *Turner Broadcasting Sys. v. Fed. Communications Comm.* (1994), 512 U.S. 622, 641–642, 114 S.Ct. 2445, 129 L.Ed.2d 497. In contrast, a regulation that is unrelated to the content of speech, a content-neutral regulation, is subject to an intermediate level of scrutiny. Id. at 642, 114 S.Ct. 2445, 129 L.Ed.2d 497.

{¶ 23} A city may regulate the location of adult businesses within a zoning scheme so long as the regulation is designed to serve a substantial

---

5. Although some of the appellants in this appeal are corporations, they may nevertheless assert a First Amendment challenge. *First Natl. Bank of Boston v. Bellotti* (1978), 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707; *Moss v. Standard Drug Co.* (1952), 94 Ohio App. 269, 274, 51 O.O. 423, 115 N.E.2d 48 (stating that corporations are "persons" within the meaning of the Fourteenth Amendment).

6. We recognize that adult entertainment businesses, including bookstores, are protected speech under the First Amendment. *R.A.V. v. St. Paul* (1992), 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (stating that "[t]he First Amendment generally prevents government from proscribing speech"); *Cleveland v. Daher* (Dec. 14, 2000), 8th Dist. No. 76975, 2000 WL 1844739. See, generally, *Los Angeles v. Alameda Books, Inc.* (2002), 535 U.S. 425, 445, 122 S.Ct. 1728, 152 L.Ed.2d 670 (Kennedy, J., concurring in the judgment) (stating that in *Renton v. Playtime Theatres, Inc.* [1986], 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29, the Supreme Court determined that the material inside adult bookstores is speech).

government interest, and leaves open reasonable alternative avenues of communication of that speech. *Renton v. Playtime Theatres, Inc.* (1986), 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29. See, also, *Young v. Am. Mini Theatres, Inc.* (1976), 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310; *United States v. O'Brien* (1968), 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. In *Renton,* the United States Supreme Court confirmed its recognition of a substantial government interest in a city's attempt to preserve the quality of urban life. *Renton,* 475 U.S. at 50, 106 S.Ct. 925, 89 L.Ed.2d 29. The court stated that zoning ordinances that regulate the location of adult businesses are content-neutral so long as they are aimed at the secondary effects of adult businesses and not at the content of the speech. Id. at 49, 106 S.Ct. 925, 89 L.Ed.2d 29. See, also, *Erie v. Pap's A.M.* (2000), 529 U.S. 277, 291, 120 S.Ct. 1382, 146 L.Ed.2d 265. The court further stated that zoning ordinances designed to battle the secondary effects of sexually oriented businesses are to be reviewed under the standards governing content-neutral time, place, and manner restrictions. *Renton,* 475 U.S. at 49–50, 106 S.Ct. 925, 89 L.Ed.2d 29.

{¶ 24} The Supreme Court has also acknowledged that municipalities generally have a better understanding of and experience with the negative secondary effects that result from certain speech than do the courts, and that therefore, municipalities will only be required to "rely upon evidence that is 'reasonably believed to be relevant' to the secondary effects that they seek to address." *Los Angeles v. Alameda Books, Inc.* (2002), 535 U.S. 425, 442, 122 S.Ct. 1728, 152 L.Ed.2d 670, quoting *Erie,* 529 U.S. at 296, 120 S.Ct. 1382, 146 L.Ed.2d 265.

{¶ 25} Because the zoning ordinance in the instant case does not ban sexually oriented businesses altogether, but rather prescribes certain districts within which the businesses are to be located, the ordinance is properly reviewed as a form of content-neutral time, place, and manner regulation. See *Renton,* 475 U.S. at 46, 106 S.Ct. 925, 89 L.Ed.2d 29, citing *Young,* 427 U.S. at 63, 96 S.Ct. 2440, 49 L.Ed.2d 310, and fn. 18; *Young,* 427 U.S. at 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (upholding a 1,000–foot restriction on the location of adult theaters, and stating that "[t]he situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech. Here, however, the District Court specifically found that '[t]he Ordinances do not affect the operation of existing establishments but only the location of new ones' ").

{¶ 26} Prior to adoption of the zoning ordinance, Wooster's law director cautioned members of the city council that the intent in enacting the ordinance must be to reduce the negative secondary effects of sexually oriented businesses, and not to regulate speech. The preamble to the zoning ordinance unambiguously states that the ordinance was drafted to combat secondary effects of sexually oriented businesses:

"WHEREAS, there is convincing documented evidence that sexually oriented businesses, because of their very nature, have a deleterious effect on both the existing businesses around them and the surrounding residential areas adjacent to them, *causing increased crime and the downgrading of property values;* and

"WHEREAS, it is recognized that sexually oriented businesses, due to their nature, have serious objectionable operational characteristics, particularly when they are located in close proximity to each other, thereby *contributing to urban blight and downgrading the quality of life in the adjacent area;* and

"WHEREAS, this City Council *desires to minimize and control these adverse effects and thereby protect the health, safety, and welfare of the citizenry; protect the citizens from increased crime; preserve the quality of life; preserve the property values and character of surrounding neighborhoods, and deter the spread of urban blight;* and

"WHEREAS, it is not the intent of this Ordinance to suppress any speech activities protected by the First Amendment, but to enact a content-neutral ordinance which addresses the secondary effects of sexually oriented businesses." (Emphasis added.)

{¶ 27} Likewise, Section 1 of the proposed zoning ordinance indicates the purpose of the ordinance and further renounces any intent on Wooster's part to restrict speech. It provides:

"It is the purpose of this Ordinance to establish reasonable and uniform regulations to prevent the deleterious location and concentration of sexually oriented businesses within [Wooster]. The provisions of this Ordinance have neither the purpose nor effect of imposing a limitation or restriction on the content of any communicative materials, including sexually oriented materials. Similarly, it is not the intent nor effect of this Ordinance to restrict or deny access by adults to sexually oriented materials protected by the First Amendment, or to deny access by the distributors and exhibitors of sexually oriented entertainment to their intended market."

{¶ 28} In its decision dated July 17, 2003, the trial court concluded that the zoning ordinance is constitutional. The court reasoned as follows:

"There is sufficient evidence in the record before [Wooster City Council] to support [Wooster's] position that the ordinance was passed to address the secondary effects of sexually oriented businesses and not to restrict [Erotica's] exercise of first amendment rights. Also, [Wooster] has not zoned sexually oriented businesses out of existence."

{¶ 29} In its findings of fact and conclusions of law, the trial court explicitly concluded that the evidence of "secondary effects" relied upon by the city council

was sufficient to meet the *Renton* standard. The court stated that the information presented to the city council regarding secondary effects was "'reasonably believed to be relevant to the problem' before it." The trial court specifically cited the information presented at the public hearings by the public, the preamble to the zoning ordinance amendment itself, and council members' comments regarding case studies as well as an acknowledgement of such secondary effects.

{¶ 30} At the June 26, 2002 meeting of the Wooster Planning Commission, staff member Val Jesionek cautioned that sexually oriented businesses were protected by the First Amendment and that the commission should not "zone out" these types of businesses. The minutes from this meeting indicate that the Director of Administration for Wooster, Mike Sigg, stated that in passing such an ordinance, Wooster did not want to suggest that it was eliminating an otherwise lawful purpose, but that Wooster felt that the sexually oriented businesses needed to be kept in districts where their age appropriateness would be more suitable and suggested at the meeting that Wooster regulate the businesses by zoning them into certain districts.

{¶ 31} The minutes of the August 19, 2002 meeting of the city council indicate that a public hearing regarding the zoning ordinance was held at that meeting. The minutes reflect that council member O'Planick discussed the detrimental secondary effects of sexually oriented businesses. Specifically, the minutes report O'Planick's statement as follows:

"It had been proven that the secondary effects of [sexually oriented businesses] are extremely detrimental to a community such as increased crime, decreased property values of businesses near them, poor tax revenues, spread of sexually transmitted diseases, sexual harassment, littering of pornographic materials, etc."

{¶ 32} Additionally, council member Robison referred to case studies of sexually oriented businesses in Newport, Kentucky, and Covington, Kentucky that described the devastating effect that those businesses had on these communities. The minutes from the August 19, 2002 meeting also indicate that a pastor who had returned from a national profamily legislative conference on the effect of pornography on families and children reported to city council on the statistics he gathered from the conference. He cited statistics regarding an increased incidence of molestation, rape, and the number of adult sex offenders.

{¶ 33} In addition, these minutes reveal that during the meeting council member Mitten had in her possession a document entitled "Protecting Communities from Sexual Oriented Businesses," and that the document noted the fact that these businesses may create public nuisances, and that some may essentially become houses of prostitution or meeting places for public sexual contact. The Wooster law director followed up this discussion with the statement that cases

where such establishments have been found to be public nuisances, the businesses generally have a track record of illegal activity documented by the police. Additionally, the record indicates that the Wooster law director informed the council members of the First Amendment implications involved in the regulation of sexually oriented businesses.

{¶ 34} At a hearing held before the trial court on June 6, 2003, Wooster's attorney requested the court to consider the fact that the city council took "legislative notice" of the negative secondary effects of adult entertainment businesses on other communities. Based on the abundance of literature describing the deleterious effects of these establishments, Wooster's attorney argued that it was unnecessary that the city council read and study the materials prior to their vote.

{¶ 35} A municipality may rely on studies and evidence from other cities regarding negative secondary effects of adult uses in support of its own ordinance, so long as the evidence relied upon is "reasonably believed to be relevant to the problem the city addresses." *Union Twp. Bd. of Trustees v. Old 74 Corp.* (2000), 137 Ohio App.3d 289, 300, 738 N.E.2d 477, citing *Renton*, 475 U.S. at 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29, and *Barnes v. Glen Theatre, Inc.* (1991), 501 U.S. 560, 584, 111 S.Ct. 2456, 115 L.Ed.2d 504. See, also, *Wolfe v. Brice* (S.D.Ohio 1999), 37 F.Supp.2d 1021, 1024, citing *CLR Corp. v. Henline* (C.A.6, 1983), 702 F.2d 637, 639 (stating that a city must set forth factual justifications in support of its intent to address the secondary effects of adult businesses). The Supreme Court has noted that it does not intend for the city's burden of proof to be "unnecessarily rigid." *Renton*, 475 U.S. at 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (also stating that a city may rely not only on experiences of other cities, but also on the summarized findings found in other court opinions). In a recent decision, the United States Supreme Court expressly refused to heighten a municipality's burden of proof to show that the evidence it relied upon was reasonably believed to be related to the problems it faces. *Alameda Books*, 535 U.S. at 437, 122 S.Ct. 1728, 152 L.Ed.2d 670. The court asserted that a city should not be required to demonstrate that its ordinance will successfully eradicate those negative secondary effects that it hopes to eliminate. Id. at 439, 122 S.Ct. 1728, 152 L.Ed.2d 670. The court explained:

"Our cases have never required that municipalities make such a showing, certainly not without actual and convincing evidence from [the opposing party] to the contrary. Such a requirement would go too far in undermining our settled position that municipalities must be given a ' "reasonable opportunity to experiment with solutions" ' to address the secondary effects of protected speech." (Citations omitted.) Id., quoting *Renton*, 475 U.S. at 52, 106 S.Ct. 925, 89 L.Ed.2d 29, and *Young*, 427 U.S. at 71, 96 S.Ct. 2440, 49 L.Ed. 2d 310.

{¶ 36} Furthermore, the court declared that if the party challenging the ordinance's constitutionality does not meet its burden to substantively refute a municipality's evidence in support of the ordinance, then the party's attempt to invalidate the legislation on constitutional grounds essentially fails:

"If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton.* If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." Id. at 438–439, 122 S.Ct. 1728, 152 L.Ed.2d 670.

{¶ 37} This statement is consistent with the principle that the party challenging the constitutionality of a legislative enactment retains the burden to demonstrate the unconstitutionality of the enactment. See *Goldberg,* 81 Ohio St.3d at 214, 690 N.E.2d 510. In the instant case, Erotica fails to demonstrate that the evidence relied upon by Wooster does not substantively support their position; nor does it set forth any other evidence that refutes Wooster's rationale that the zoning ordinance will combat the various negative secondary effects. See *Alameda Books,* 535 U.S. at 439, 122 S.Ct. 1728, 152 L.Ed.2d 670. Erotica has failed to meet its burden in this respect.

{¶ 38} Erotica surmises that Wooster "relied upon its officials' own hunches or prejudices, rather than upon concrete and reliable evidence, in passing the [zoning] [o]rdinance," and that the record does not establish that the city council actually relied on existent studies concerning the secondary effects of sexually oriented businesses on communities. However, upon a thorough review of the record, we find that the evidence indicates otherwise. The minutes of the public hearing on August 19, 2002 reveal that the Wooster city council members were aware of studies and other evidence discussing negative secondary effects, and that they considered this information prior to passing the ordinance amendment. We conclude that the record does support a finding that the council relied on information regarding the negative secondary effects of sexually oriented businesses.

{¶ 39} The information in the record suggests that it remains unclear exactly which materials or studies the city council had before it when discussing the zoning ordinance. However, this fact is not necessarily fatal. See *Triplett Grille, Inc. v. Akron* (C.A.6, 1994), 40 F.3d 129, 135; *Threesome Entertainment v. Strittmather* (N.D.Ohio 1998), 4 F.Supp.2d 710, 719 (stating that municipal legislators are not required to review studies themselves "so long as they receive recommendations from knowledgable persons"), citing *Lakeland Lounge of Jack-*

*son, Inc. v. Jackson* (C.A.5, 1992), 973 F.2d 1255 (stating that city council members need not "personally physically review the studies of secondary effects"). See, e.g., *BAS Enterprize, Inc. v. Maumee* (N.D.Ohio 2003), 282 F.Supp.2d 673, 682.

{¶ 40} Moreover, "it is apparent that adverse secondary effects may and do occur around these adult businesses." *Brookpark News & Books, Inc. v. Cleveland* (1990), 66 Ohio App.3d 613, 617, 585 N.E.2d 908. See, generally, *Renton*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29. Thus, "it is no longer open to debate whether a substantial governmental interest exists in the regulation of the location of adult businesses to prevent urban blight." *Brookpark News*, 66 Ohio App.3d at 617, 585 N.E.2d 908. The United States Supreme Court's acknowledgment of this substantial government interest reflects the general recognition of the secondary effects that accompany adult businesses. Erotica's complaints essentially challenge the cases that acknowledge a relationship between adult businesses and negative secondary effects on the neighboring community. There is no question that such businesses present serious, inevitable ramifications for neighboring communities.

{¶ 41} Additionally, we observe that a number of courts have sustained adult business ordinances and statutes without preenactment evidence of negative secondary effects. See *Barnes v. Glen Theatre, Inc.* (1991), 501 U.S. 560, 584, 111 S.Ct. 2456, 115 L.Ed.2d 504 (Souter, J., concurring in judgment) (stating that despite the absence of a legislative record documenting secondary effects of nude dancing, this entertainment is of the same character as adult motion picture theatres in *Renton*, and that therefore it "is no leap to say that live nude dancing * * * is likely to produce the same pernicious secondary effects"); *Erie v. Pap's A.M.* (2000), 529 U.S. 277, 296–297, 120 S.Ct. 1382, 146 L.Ed.2d 265; *Triplett Grille*, 40 F.3d at 135 (citing an Akron city councilman's testimony that the city supported the ordinance in part to prevent secondary effects); *DLS, Inc. v. Chattanooga* (C.A.6, 1997), 107 F.3d 403, 410–411 (upholding an adult business ordinance although the decision was based in part on postenactment evidence); *Brookpark News*, 66 Ohio App.3d at 617, 585 N.E.2d 908. See, also, *11126 Baltimore Blvd. v. Prince George's Cty., Md.* (C.A.4, 1989), 886 F.2d 1415 (relying in part on the doctrine of legislative notice to uphold ordinances); *Phillips v. Borough of Keyport* (C.A.3, 1997), 107 F.3d 164, 178 (finding an insistence on the creation of a legislative record to be an unwarranted intrusion into the internal affairs of the legislative branch of governments).

{¶ 42} We find these cases persuasive, and apply their reasoning to the instant case to conclude that the trial court could properly find that the evidence cited by Wooster in support of the zoning ordinance is reasonably believed to be relevant to Wooster's desire to eliminate and prevent the negative secondary effects of

sexually oriented businesses. As noted above, the zoning ordinance in the instant case is designed to regulate the location of sexually oriented businesses and not to suppress or greatly hinder access to the speech. Therefore, we find that the trial court correctly concluded that the zoning ordinance governing the location of sexually oriented businesses does not seek to control the content of the materials sold by sexually oriented businesses. Furthermore, as the zoning ordinance is designed to regulate the location of sexually oriented businesses, we find that the zoning ordinance serves the firmly established substantial government interest in combating negative secondary effects.[7]

{¶ 43} In sum, we find that Erotica did not meet its burden to establish that the zoning ordinance is unconstitutional. Additionally, we find that Wooster satisfied the *Renton* standard in enacting this zoning ordinance. Thus, this court finds that the trial court did not err in determining that the zoning ordinance is constitutional. Accordingly, Erotica's first assignment of error is overruled.

## B

### Second Assignment of Error

"The trial court erred in finding that Erotica was not a non-conforming use immune from compliance with Ordinance No.2002–49."

{¶ 44} In its second assignment of error, Erotica contends that the trial court erred in finding that Erotica did not qualify as a nonconforming use. We disagree.

{¶ 45} A nonconforming use of land is a use that was lawful before the enactment of a zoning amendment, but one which, although no longer valid under the current zoning rules, may be lawfully continued. *C.D.S., Inc. v. Gates Mills* (1986), 26 Ohio St.3d 166, 168, 26 OBR 142, 497 N.E.2d 295. "The Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution recognize a right to continue a given use of real property if such use is already in existence at the time of the enactment of a land use regulation forbidding or restricting the land use in question." *Dublin v. Finkes* (1992), 83 Ohio App.3d 687, 690, 615 N.E.2d 690, citing *Akron v. Chapman*

---

7. Furthermore, we observe that the zoning ordinance specifically provides that sexually oriented businesses are to be located in districts designated as "community shopping center," "planned business," "general manufacturing," or "open space manufacturing" districts. Wooster Codified Ordinance 1122.16(c). Although Erotica does not challenge on appeal whether the zoning ordinance leaves open adequate alternative channels of communication for sexually oriented businesses, in the absence of evidence to the contrary, we believe that it does.

(1953), 160 Ohio St. 382, 52 O.O. 242, 116 N.E.2d 697, paragraph two of the syllabus.

{¶ 46} In the instant case, Wooster sought statutory injunctive relief pursuant to R.C. 713.13. This statute section provides:

"No person shall erect, construct, alter, repair, or maintain any building or structure or use any land in violation of any zoning ordinance or regulation enacted pursuant to sections 713.06 to 713.12, inclusive, of the Revised Code, or Section 3 of Article XVIII, Ohio Constitution. In the event of any such violation, or imminent threat thereof, the municipal corporation * * * may institute a suit for injunction to prevent or terminate such violation."

{¶ 47} The zoning ordinance in this case provides that "[a]ny sexually oriented business *lawfully operating on the effective date* of Section 1122.16 of this code that is in violation of Section 1122.16 of this code shall be deemed a nonconforming use." [8] (Emphasis added.) Wooster Codified Ordinance 1122.16(j). See, also, R.C. 713.15. The zoning ordinance was passed on August 19, 2002, and took effect on September 19, 2002.

{¶ 48} In an action for a zoning violation, a city has the initial burden of proving a violation. See *Schmidt v. Barton* (Jan. 12, 1977), 9th Dist. No. 8184. The landowner claiming the defense of a valid, nonconforming use must then prove, by a preponderance of the evidence, that the use existed on the effective date of the zoning change, and furthermore, that the use was legal at that time. *Bd. of Trustees of Columbia Twp. v. Albertson* (Oct. 17, 2001), 9th Dist. No. 01CA007785, 2001 WL 1240135, citing *Booghier v. Wolfe* (1990), 67 Ohio App.3d 467, 473, 587 N.E.2d 375.

{¶ 49} Whether the case is civil or criminal, judging the credibility of the witnesses and the weight to be given to the evidence are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Before an appellate court will reverse a judgment as being against the manifest weight of the evidence, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541; *In re James* (Oct. 14, 1998), 9th Dist. No. 18936, 1998 WL 716915.

{¶ 50} In *Smith v. Juillerat* (1954), 161 Ohio St. 424, 53 O.O. 340, 119 N.E.2d 611, the Supreme Court of Ohio articulated a standard for deciding whether a property owner has acquired a vested right to the use of his or her property:

---

8. The Wooster Codified Ordinances, as amended, also define the term "Sexually Oriented Business" to include adult bookstores. Wooster Codified Ordinance 1131.01.

"[W]here no substantial nonconforming use is made of property, even though such use is contemplated, and money has been expended in preliminary work to that end, a property owner acquires no vested right to such use and is deprived of none by the operation of a valid zoning ordinance denying the right to proceed with his intended use of the property." Id. at 431, 53 O.O. 340, 119 N.E.2d 611. See, also, *Torok v. Jones* (1983), 5 Ohio St.3d 31, 33–34, 5 OBR 90, 448 N.E.2d 819.

{¶ 51} Ohio courts have held that the failure to establish that a permitted use occurred prior to a change in the zoning law renders this use nonconforming, and eliminates the property owner's right to the use. *Smith v. Wadsworth* (Oct. 23, 1996), 9th Dist. No. 2550–M, 1996 WL 603849, citing *Schreiner v. Russell Twp. Bd. of Trustees* (1990), 60 Ohio App.3d 152, 573 N.E.2d 1230.

{¶ 52} In *Juillerat*, the Supreme Court had occasion to assess whether a landowner wishing to strip-mine his land had established a nonconforming use prior to the adoption of a local zoning ordinance that prohibited strip mining. The landowner had applied for and obtained a license for use in connection with the land, had entered into leases with nearby property owners, and had drilled a hole on the land for testing purposes. Nevertheless, the court stated that, because no coal had actually been mined and the landowner was not prepared to mine at the time the ordinance took effect, a nonconforming use was not established. Id. at 431, 53 O.O. 340, 119 N.E.2d 611. See *Booghier*, 67 Ohio App.3d at 471, 587 N.E.2d 375 (upholding an injunction to enjoin a property owner from operating an adult business where the premises were not open for business as of the date the zoning was changed).

{¶ 53} Additionally, the use must be lawful at the time the use was established to qualify as a nonconforming use. *Pschesang v. Terrace Park* (1983), 5 Ohio St.3d 47, 5 OBR 104, 448 N.E.2d 1164, syllabus; *Matthews v. Pernell* (1990), 64 Ohio App.3d 707, 709, 582 N.E.2d 1075; R.C. 713.15. "[A] use not permitted by applicable zoning ordinances when the use was established does not constitute a nonconforming use." *Pschesang* at syllabus. See, also, *12701 Shaker Co. v. Cleveland* (1972), 31 Ohio App.2d 199, 209, 60 O.O.2d 324, 287 N.E.2d 814; *Castella v. Stepak* (May 14, 1997), 9th Dist. No. 96CA0057, 1997 WL 270550; see *Harris v. Fitchville Twp. Trustees* (N.D.Ohio 2001), 154 F.Supp.2d 1182, 1188, fn. 3 (holding that while topless dance performances on the property began prior to the ordinance's effective date, a substantial nonconforming use had not been established since the property owners had not obtained the appropriate permits and were in violation of zoning and building code regulations).

{¶ 54} The zoning ordinance in the instant case provides that a sexually oriented business that was "lawfully operating" at the time that the ordinance became effective will be deemed a nonconforming use. Wooster Codified Ordi-

nance 1122.16(j). As noted above, the parties stipulated to the fact that Erotica was not open and operating as of September 19, 2002, the effective date of the zoning ordinance. Prior to this date, Erotica had purchased the premises, obtained zoning and building permits, and made certain improvements that had not yet been deemed in compliance with all zoning and building code regulations.

{¶ 55} In its findings of fact and conclusions of law, the trial court made the following findings:

"17. As of September 19, 2002, the effective date of the Zoning Ordinance, [Erotica] was not lawfully operating a sexually oriented business at the Premises.

"18. As of September 19, 2002, [Erotica] had not commenced work on the plumbing or the HVAC at the Premises.

"19. On September 19, 2002, an electrician hired by [Erotica] was illegally working at the Premises without a permit for electrical work and without having applied for a permit. [Boron] did not begin lawful electrical work until October 2, 2002.

"20. As of October 10, 2002, [Erotica] had not remodeled the Premises as specified in the plans he submitted to [Wooster], and was required to modify construction * * *.

"21. As of October 24, 2002, [Erotica's] building plans for the Premises had not been approved by [Wooster].

"22. [Erotica] had not completed construction sufficient to allow a Certificate of Occupancy to be issued until October 29, 2002.

"23. As of October 31, 2002, when the Court issued a Temporary Restraining Order enjoining [Erotica] from using the Premises as a sexually oriented business, [Boron] had not opened for business."

{¶ 56} In its final order, the trial court noted that the parties did not contest that Erotica's location does not comply with the zoning ordinance in this case. The court then concluded that Erotica's use did not exist prior to the change in the zoning ordinance, and that the nonconforming use defense failed as a result.

{¶ 57} The trial court relied on *Harris*, 154 F.Supp.2d 1182, and *Juillerat* for this conclusion, stating that it found these cases persuasive on the nonconforming use question. In *Harris*, the district court reviewed a regulation adopted by the Fitchville Township Board of Trustees on December 27, 1999, which governed the location of adult cabarets and other adult-oriented businesses, and also conditioned the operation of these businesses on the acquisition of a current, valid permit. The court found, inter alia, that "although [plaintiffs] expended funds on preliminary work and contemplated use of their site as an adult cabaret, no substantial nonconforming use of the property was made prior to the effective

date of the regulations [on January 26, 2000]." *Harris,* 154 F.Supp.2d at 1188. The court further noted that the fact that plaintiffs began to offer topless performances on the site in a construction trailer prior to the regulations' effective date did not amount to a nonconforming use; the court reasoned that the construction trailer did not comply with the state building codes, and therefore was not lawful. Id. at 1188, fn. 3.

{¶ 58} Additionally, the court in *Harris* rejected the plaintiffs' claim that they had a vested right to the use of their property as a cabaret prior to the effective date, since they had applied for and received a permit and had begun construction before the regulations were passed, and because 95 percent of the building was completed before the regulations' effective date. The plaintiffs based their argument on *Gibson v. Oberlin* (1960), 171 Ohio St. 1, 12 O.O.2d 1, 167 N.E.2d 651, which stated:

"Where * * * a property owner has complied with all the legislative requirements for the procurement of a building permit, and his proposed structure falls within the use classification of the area in which he proposes to build it, he has a right to such permit * * *. Subsequent legislation enacted pending applicant's attempted enforcement of such right * * * cannot deprive him of the right. The right became vested, under the law applicable thereto, upon the filing of the application for the permit." Id. at 5–6, 12 O.O.2d 1, 167 N.E.2d 651.

{¶ 59} However, the court found that the application of this principle to the plaintiffs' case was misplaced, because the standard for the issuance of a building permit is to be distinguished from the one governing the establishment of a specific use as articulated in *Juillerat. Harris,* 154 F.Supp.2d at 1188. Indeed, logically, the facts that a landowner receives a building or zoning permit and that general construction has occurred or improvements have been made, do not help to establish that the premises were used in a particular manner.

{¶ 60} We find the court's analysis in *Harris* persuasive, as well. This court cannot find that this set of circumstances alone is sufficient to establish a substantial nonconforming use as set forth in *Juillerat.*

{¶ 61} Erotica argues that by undertaking actions to improve the existing building, applying for required building and construction permits, and representing an *intention* to use the property as an adult bookstore prior to the effective date of the zoning ordinance, that such actions were sufficient to establish a nonconforming use under the *Juillerat* standard. See, e.g., *Harris,* 154 F.Supp.2d at 1188. Erotica opines that it has effectively been penalized by Wooster for adding value to his property, and complains that it faced "governmental delays in the permitting process." Additionally, Erotica claims that the fact that it *could* have opened the business for operation without making improvements is sufficient to

establish a nonconforming use. While we do not reach a determination as to whether Erotica actually had the ability to operate a business at that time, we do not see how the *ability* or *intention* to operate a store can possibly be sufficient to establish a use, let alone a substantial one; nor does Erotica cite any case law to support this contention. Moreover, even if Erotica were to establish a substantial nonconforming use, it is still required to show that the use is lawful, and Erotica has failed to do so.

{¶ 62} We do not necessarily disagree with the trial court's notation of the fact that the nonconforming use issue in this particular case is a "closer question." However, the current state of the law compels this court to conclude that actual operation, and not a mere intention, or a *claim* of intention to operate, must be shown to establish a nonconforming use pursuant to the *Juillerat* standard.

{¶ 63} Based upon the foregoing, we find that Erotica was not in lawful operation on September 19, 2002, and that Erotica has failed to establish, by a preponderance of the evidence, that a substantial nonconforming use existed on the effective date of the zoning change. Thus, this court concludes that the trial court did not err when it found that Erotica failed to establish a nonconforming use immune from the zoning ordinance. Accordingly, Erotica's second assignment of error is overruled.

## C

### Third Assignment of Error

"The trial court erred in granting equitable injunctive relief to the city in light of the fact that the city came to court with unclean hands."

{¶ 64} In its third assignment of error, Erotica attests that the trial court erred in granting Wooster equitable injunctive relief because Wooster came to court with unclean hands. Specifically, Erotica contends that the trial court failed to properly consider their unclean-hands defense, and improperly construed this defense as an estoppel argument. Erotica's contentions lack merit.

{¶ 65} The decision to grant or deny an injunction is solely within the discretion of the trial court. *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.* (1995), 73 Ohio St.3d 590, 653 N.E.2d 646, paragraph three of the syllabus. An appellate court will not reverse such a decision absent a clear abuse of discretion. Id. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d

619, 621, 614 N.E.2d 748. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Id.

{¶ 66} The doctrine of "clean hands" is an equitable doctrine. See, generally, *Basil v. Vincello* (1990), 50 Ohio St.3d 185, 190, 553 N.E.2d 602; *Brosky v. Brosky* (Mar. 28, 2001), 9th Dist. No. 00CA007662, 2001 WL 298234, citing *Marinaro v. Major Indoor Soccer League* (1991), 81 Ohio App.3d 42, 45, 610 N.E.2d 450. This doctrine prescribes that when "a party takes the initiative to set in motion the judicial machinery to obtain some remedy but has violated good faith by his prior-related conduct, the court will deny the remedy." *Marinaro,* 81 Ohio App.3d at 45, 610 N.E.2d 450. "The maxim, 'he who comes into equity must come with clean hands,' requires only that the plaintiff must not be guilty of reprehensible conduct with respect to the subject matter of [the] suit." Id.

{¶ 67} In the instant case, Wooster brought this action pursuant to R.C. 713.13, which sets forth a statutory injunctive remedy for municipal corporations in the event that a zoning ordinance is violated. The Supreme Court of Ohio has expressly recognized the difference between a statutory injunction action and an equitable injunction action. *Ackerman v. Tri–City Geriatric & Health Care, Inc.* (1978), 55 Ohio St.2d 51, 57, 9 O.O.3d 62, 378 N.E.2d 145. In *Ackerman,* the court noted, "the traditional concepts for the issuance of equity injunctions do not apply in statutory injunction actions." *Ackerman,* 55 Ohio St.2d at 56, 9 O.O.3d 62, 378 N.E.2d 145. Specifically, the court stated:

"It is established law in Ohio that, when a statute grants a specific injunctive remedy to an individual or to the [S]tate, the party requesting the injunction 'need not aver and show, as under ordinary rules in equity, that great or irreparable injury is about to be done for which he has no adequate remedy at law.'" *Ackerman,* 55 Ohio St.2d at 56, 9 O.O.3d 62, 378 N.E.2d 145, quoting in part *Stephan v. Daniels* (1875), 27 Ohio St. 527, 536, 1875 WL 203. See, also, *Union Twp. Bd. of Trustees v. Old 74 Corp.* (2000), 137 Ohio App.3d 289, 294–295, 738 N.E.2d 477.

{¶ 68} Furthermore, the Supreme Court acknowledged the position that the traditional balancing of equities is unnecessary in a situation in which an injunctive remedy is sought pursuant to a statute that serves the purpose of providing a governmental agent with the means to enforce public policy. *Ackerman,* 55 Ohio St.2d at 56, 9 O.O.3d 62, 378 N.E.2d 145. The court explained that statutory injunction remedies, which grant government agents the right to sue to enjoin activities that the General Assembly has deemed to be not in the public interest, have as their *principal* purpose the prevention of harm to the general public, and not the attainment of justice for the individual parties involved. Id. at 57, 9 O.O.3d 62, 378 N.E.2d 145. Therefore, "statutory injunctions should issue if

the statutory requirements are fulfilled." Id. See, also, *Bridle v. Hudson Twp.* (Jan. 25, 1989), 9th Dist. No. 13731, 1989 WL 7445, and *State ex rel. Scadden v. Willhite* (Mar. 26, 2002), 10th Dist. No. 01AP–800, 2002 WL 452472 (stating that "with regard to municipal zoning under R.C. 713.13, it would be inappropriate to balance equities because the zoning statute is not designed primarily to do justice to the parties but to prevent harm to the general public").

{¶ 69} Moreover, Ohio courts have expressed the clear position that equitable defenses generally do not apply to bar a claim made by a governmental unit. See, generally, *Halluer v. Emigh* (1992), 81 Ohio App.3d 312, 318, 610 N.E.2d 1092 (stating the principles of estoppel and the equitable defense of laches generally do not apply against the state or its agents). See, also, *State ex rel. Chester Twp. Bd. of Trustees v. Makowski* (1984), 12 Ohio St.3d 94, 96, 12 OBR 82, 465 N.E.2d 453, and *Richfield v. Nagy* (Mar. 5, 1986), 9th Dist. No. 12300, 1986 WL 2914 (recognizing that the equitable defense of laches generally does not apply against the government to bar a claim). Similarly, the equitable doctrine of clean hands should not apply to bar a governmental unit's claim, and certainly should not serve to stifle a government's ability to defend the public interest and to protect it from proscribed behavior. See *Ackerman*, 55 Ohio St.2d at 57, 9 O.O.3d 62, 378 N.E.2d 145.

{¶ 70} Furthermore, we observe that the trial court, in its findings of fact and conclusions of law, determined that "[Wooster's] issuance of various permits to [Erotica] does not estop [Wooster] from pursuing its claims in the lawsuit. [Wooster] was simply following the law and cannot be penalized for such conduct. [Wooster's] hands are clean." Thus, contrary to Erotica's claim on appeal, the trial court did substantively address its defense of unclean hands, and ultimately we do not find merit in its argument that the court confused this defense with that of estoppel.

{¶ 71} We are not required, due to our determination above, to discuss substantively whether Wooster initiated this injunction action with unclean hands. However, we find it important to acknowledge Wooster's argument that those activities that Erotica claims to have been "inequitable" are the actions taken by Wooster to enforce its building code and zoning ordinance, and that such actions necessarily cannot and should not be considered "reprehensible conduct." See *Marinaro*, 81 Ohio App.3d at 45, 610 N.E.2d 450. Furthermore, we recognize that building regulations and zoning regulations are separate, independent sources of regulation.

{¶ 72} In this case, Wooster did not seek to enjoin Erotica from constructing a building on the premises, making improvements to the existing building, or using the building in general. Indeed, Erotica can employ its current construction for

any lawful purpose. If Erotica refuses to employ the premises for such uses, then that is Erotica's free choice and prerogative. Nothing in the record indicates to this court that Wooster took actions to enjoin *any* type of use of the building; rather, it simply sought to enforce its zoning ordinance, which requires that sexually oriented businesses be located in certain parts of the municipality. We cannot find sufficient basis in the record for a conclusion that Wooster had unclean hands in its administration of the zoning ordinances and building codes.

{¶ 73} Thus, we find that the trial court did not err in its handling of Erotica's unclean hands defense in this case, and therefore conclude that the trial court did not abuse its discretion in granting the injunction. See *Pons*, 66 Ohio St.3d at 621, 614 N.E.2d 748. Accordingly, Erotica's third assignment of error is overruled.

{¶ 74} As we have already noted above, Erotica's location violates the provisions of the zoning ordinance. Since we have determined that the zoning ordinance is constitutional and that Erotica did not establish a nonconforming use, Wooster is entitled to enforce the ordinance, and Erotica must comply with the zoning ordinance's mandates.

### III

{¶ 75} Erotica's first, second, and third assignments of error are overruled. The decision of the Wayne County Court of Common Pleas is affirmed.

Judgment affirmed.

WHITMORE, P.J., and SLABY, J., concur.